# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Abingdon Division

| | |
|---|---|
| LAURA JAKUBAUSKAS, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:24-cv-00057 |
| EMORY AND HENRY UNIVERSITY, | ) |
| Defendant. | ) |

### FIRST AMENDED COMPLAINT

Emory & Henry University did not want sixty year old equestrian coach – it wanted one thirty years younger. The University desperately wanted a pretext that it could use to replace Plaintiff with a younger employee, and finally got what it wanted when a false Title IX complaint was filed against Ms. Jakubauskas. When the University was already communicating about her replacement, the University received this complaint and jumped into action, terminating Ms. Jakubauskas within days of receiving the complaint. In doing so, the University completely ignored federal regulations enforcing Title IX and instead summarily terminated her. Accordingly, Ms. Jakubauskas brings this civil action against Defendant for violations of the Age Discrimination in Employment Act ("ADEA"), the Virginia Human Rights Act ("VHRA"), negligence, and negligence *per se*. For her First Amended Complaint against Defendant, Laura Jakubauskas states as follows:[1]

---

[1] This First Amended Complaint is filed pursuant to the Court's June 12, 2025 Order, which ordered Plaintiff to file within 21 days of the Order. ECF No. 21. Plaintiff's counsel apologizes for this late

## Parties

1. Laura Jakubauskas ("Ms. Jakubauskas") was an assistant clinical professor or equine studies at the University. She is sixty-one years old.

2. Emory & Henry University (the "University") is a private higher education institution located in Washington County, Virginia.

## Jurisdiction and Venue

3. This Court possesses federal question subject matter jurisdiction over the federal claim in this case and supplemental jurisdiction over the state law claims in this case.

4. This Court possesses personal jurisdiction over the University by virtue of its domicile and its transacting business in the Commonwealth. Va. Code § 8.01-328.1(A).

5. Venue is proper in this Court because all causes of action arose in this judicial district.

## The University's Background

6. Institutions of higher education are required by law, as interpreted by the United States Supreme Court, to adjudicate claims of sexual harassment under the auspices of Title IX.

---

filing, which comes two business days after the Court's deadline. This error was entirely counsel's and not Plaintiff's, and therefore counsel respectfully begs the Court's forgiveness of the error without imposing any adverse action on Plaintiff.

7. Title IX is a federal statute prohibiting discrimination on the basis of sex for all persons in educational institutions that receive federal funding. *See* 20 U.S.C. § 1681.

8. The University receives federal funding. Withdrawal of federal funding by the U.S. Department of Education would be financially ruinous for the University.

9. The University maintains a Title IX Office.

10. The University's Title IX personnel, including Title IX Coordinator Yancey Wilmoth, received training on the controlling Title IX regulations.

11. The University's Human Resources Office, including Director of Human Resources Tracy Peery, also received training on the controlling Title IX regulations.

## Federal Title IX Regulations and University Policy

12. In May of 2020, the U.S. Department of Education promulgated regulations interpreting Title IX, codified at 34 C.F.R. 106, titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance."

13. The U.S. Department of Education interpreted the effective date to mean that the regulations applied to all reports of sexual harassment (construed broadly to include allegations of sexual assault and other offenses) concerning conduct occurring on or after August 14, 2020.

14. The federal regulations applied to this matter because, among other things, John Roe alleged conduct occurring exclusively in the year 2023.

15. The federal regulations set forth procedural requirements for the University's adjudication of Title IX matters. Accordingly, the University is required by the regulations to adopt these procedural provisions in its own policies and procedures, for use in student-on-student sexual misconduct complaints.

16. The University adopted the regulations' procedural requirements, as reflected in the University's "Title IX and Sexual Harassment Policy" ("Policy"), which states that the Policy is intended to "meet the University's obligations" under Title IX.

17. Therefore, the University is not at liberty to substantially alter its Policy without federal regulatory change. Rather, in exchange for federal funding and the payment of tuition by students (without which the University would not exist or be in a position to receive federal funding), the University has agreed to be bound by its regulation-compliant Policy.

18. Under the 2020 regulations, the University is obligated to respond to a "formal complaint" of sexual harassment in a way compliant with the grievance process outlined in 34 C.F.R. §106.45.

19. The term "formal complaint" is defined by 34 C.F.R. §106.30 as, in relevant part, "a document filed by a complainant or signed by the Title IX Coordinator alleging sexual harassment against a respondent and requesting that the recipient investigate the allegation of sexual harassment."

20. The Department requires that a "formal complaint" be filed, and the grievance process at 34 C.F.R. §106.45 be completed, before "the imposition of any

4

disciplinary sanctions or other actions that are not supportive measures." 34 C.F.R. §106.44(a).

21. The 34 C.F.R. 106.45 grievance process, in the context of postsecondary educational institutions receiving federal funding, requires that a University provide formal notice of the allegations against the respondent before any investigation, generate an investigative report, hold a live hearing with cross examination, and contain an appeal process before any discipline is imposed, among other things. *See generally* 34 C.F.R. §106.45(b).

22. "Each of the procedural requirements in § 106.45 is prescribed because the Department views the requirement as important to ensuring a fair process for both parties rooted in the fundamental due process principles of notice and meaningful opportunities to be heard." 85 Fed. Reg. 30053.

23. The term "formal complaint" has a static and defined meaning. If, for example, a recipient of federal funds could avoid the requirements of 34 C.F.R. §106.45 simply by labeling a complaint "informal," the entire regulatory scheme would unravel. Any college or university could use this method to simply avoid ever using the 34 C.F.R. §106.45 grievance process.

### Background of Ms. Jakubauskas and John Roe

24. Following a professional equestrian career, Ms. Jakubauskas began employment at the University in the Spring of 2023 as an assistant clinical professor in the equestrian program.

25.　Ms. Jakubauskas replaced an employee who repeatedly drank to excess on the job but was never disciplined.

26.　Ms. Jakubauskas never received any negative performance reviews during the entirety of her employment at the University.

27.　Ms. Jakubauskas thoroughly enjoyed teaching and built positive relationships with all of her students, absent any complaints from any of her students.

28.　John Roe was one of many students, male and female, who had a friendly professional relationship with Ms. Jakubauskas.

29.　John Roe was somewhat of a class clown whose company was enjoyed by other students and Ms. Jakubauskas. He frequently made jokes with his fellow students and Ms. Jakubauskas.

### The Anonymous Title IX Complaint

30.　According to the University, on or around October 27, 2023, an employee at the University submitted an Title IX complaint against Ms. Jakubauskas.

31.　On October 31, 2023, the University sent Ms. Jakubauskas an email seeking an interview related to the "informal complaint of sexual harassment." The University did not tell Ms. Jakubauskas the substance of the complaint or who made the complaint. Eventually, however, she would discover that the complaint alleged that John Roe had been made "uncomfortable" by texts and "photos" from Ms. Jakubauskas.

32.　John Roe never filed any complaint himself.

33. Nor did Ms. Jakubauskas ever send any sexual or inappropriate texts or photos (or anything else sexual whatsoever) to John Roe or any other student. While she texted many of her students and sent equestrian related photos, there was never anything remotely sexual about any of Ms. Jakubauskas's behavior with her students.

### The University Conducts its "Informal" Investigation For A Week

34. Ms. Jakubauskas sat for an interview on November 1, 2023. At that interview, both Yancey Wilmoth and Tracy Peery were present.

35. Both Wilmoth and Peery, having been trained in Title IX, knew that the "notice" sent to Ms. Jakubauskas seeking the interview was not complaint with federal regulations interpreting Title IX.

36. In fact, Wilmoth and Peery referred to the complaint against Ms. Jakubauskas as an "informal complaint." But the term "informal complaint" does not appear in University Policy.

37. The term "informal complaint" is created out of whole cloth for the sole purpose of disclaiming the regulations' requirement that a recipient follow 34 C.F.R. §106.45 in response to a "formal complaint." Wilmoth and Peery, having been trained in Title IX, knew that a "formal complaint" must be adjudicated according to 34 C.F.R. §106.45, and they referred to the complaint against Ms. Jakubauskas as an "informal complaint" for the sole purpose of avoiding the regulations.

38. Indeed, according to federal regulation, a Notice of Allegations must, among other things, "include the identities of the parties involved in the incident, if

7

known, [and] the conduct allegedly constituting sexual harassment under § 106.30, and the date and location of the alleged incident, if known." 34 C.F.R. §106.45(b)(2)(B).

39. Further, "the written notice must inform the parties that they may have an advisor of their choice, who may be, but is not required to be, an attorney, under paragraph (b)(5)(iv) of this section, and may inspect and review evidence under paragraph (b)(5)(vi) of this section." *Id.*

40. A Notice of Allegations must also "inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process." *Id.*

41. The federal government's purpose in drafting §106.45(b)(2) was that "[f]undamental fairness and due process principles require that a respondent knows the details of the allegations made against the respondent, to the extent the details are known, to provide adequate opportunity for the respondent to respond."[2]

42. The "informal" "notice" contained none of the required elements cited above. Instead, it merely said that due to "the nature of the complaint" Ms. Jakubauskas's "presence will … be required" at an interview.

43. During the interview, Ms. Jakubauskas was subjected to treatment that one would find in a Franz Kafka novel. Wilmoth and Peery were extremely hostile towards Ms. Jakubauskas; they interrogated her about a complaint where Ms.

---

[2] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30133 (May 19, 2020).

Jakubauskas did not know the details of the complaint. At the same time, they demanded confessions from Ms. Jakubauskas and accused her (without evidence) of deleting evidence in bad faith.

44. At the close of the interview, Ms. Jakubauskas offered to provide witnesses, among other things, to Wilmoth and Peery. Wilmoth and Peery told Ms. Jakubauskas "that's good" and "that's what you're supposed to be doing." At a minimum, Wilmoth and Peery never instructed Ms. Jakubauskas to not reach out to witnesses.

45. Nor could they, because federal regulations protect Ms. Jakubauskas's right to gather and present evidence and witnesses. 34 C.F.R. §106.45(b)(5)(iii) (schools may not restrict the ability of parties to gather evidence).

46. But when Ms. Jakubauskas submitted witnesses to Wilmoth and Peery or was otherwise gathering witnesses and evidence in the days following the interview, Peery reprimanded her. Peery emailed Ms. Jakubauskas that she needed to "stop reaching out to students asking them to be witnesses for you." She continued (as if gathering witnesses to support her innocence was a violation in itself): "I have evidence that you have been doing so and have violated the confidentiality of the investigation. Your actions are unprofessional and need to stop."

47. When Peery sent this email, she knew that Ms. Jakubauskas had the right to gather witnesses and that the University could not even prohibit her from discussing the investigation. 34 C.F.R. §106.45(b)(5)(iii). But she chose to intimidate Ms. Jakubauskas anyway.

9

48. University Policy and federal law afford Ms. Jakubauskas the right to be presumed "not responsible" throughout the investigation and adjudication.

49. Obviously, the University did not presume Ms. Jakubauskas not responsible. It presumed her responsible and interrogated her with that presumption in mind.

50. The University took less than one week to adjudicate the "informal" complaint against Ms. Jakubauskas. It found her responsible for the allegation against her.

51. In a meeting on November 8, 2023, Ms. Jakubauskas was notified that she was terminated from employment because of the findings of the investigation. She was immediately escorted by security to clean out her desk, and was marched off of campus.

52. During the November 8 meeting, Peery insisted (in a transparent attempt to skirt liability) that Ms. Jakubauskas was terminated "at will" despite the findings against her.

**Ms. Jakubauskas Discovers Additional Context and Exhausts Remedies**

53. After Ms. Jakubauskas was terminated, she discovered from at least three witnesses with knowledge that the University intended to replace her with a younger employee before the Title IX allegations were ever made.

54. Although the University posted the job posting on November 14, 2023, it had communications with Ms. Jakubauskas's replacement before the job was posted publicly.

55. Ms. Jakubauskas was indeed replaced by this employee, who is thirty years Ms. Jakubauskas's junior.

56. Ms. Jakubauskas filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Virginia Office of Civil Rights on March 7, 2024.

57. She received a Notice of Right to Sue from the EEOC on July 25, 2024. This Notice also suffices as a Notice of Right to Sue under the VHRA. Va. Code §2.2-3907(I).

### The University Continues to Punish Ms. Jakubauskas

58. As a result of the University's wrongful finding and termination, Ms. Jakubauskas suffers severe emotional, psychological, and financial harm.

59. While suffering this harm, and having to deal with the unexpected loss of income, Ms. Jakubauskas sought unemployment from the North Carolina Department of Commerce.

60. As the University had repeatedly told her on November 8, Ms. Jakubauskas represented to the North Carolina agency that she had been terminated "at will" and not "for cause." The former would entitle her to unemployment income whereas the latter would not.

61. In a remarkable showing of contempt towards Ms. Jakubauskas, the University opposed Ms. Jakubauskas's request for unemployment. At a hearing, counsel for the University testified and argued for the first time that Ms.

11

Jakubauskas was not terminated "at will" and instead because she sexually harassed a student.

62. Appearing pro se, Ms. Jakubauskas testified at the hearing, and successfully obtained unemployment income. The North Carolina agency further made findings of fact that, among other things, "[Ms. Jakubauskas] did not sexually harass anyone during her tenure at with Emory & Henry College."

## CAUSES OF ACTION

### COUNT I
### Age Discrimination in Violation of the ADEA

63. Ms. Jakubauskas incorporates all prior allegations as if fully stated herein.

64. Ms. Jakubauskas was an employee over 40 years of age at the University, entitling her to rights under the federal Age Discrimination in Employment Act ("ADEA").

65. The University is required to abide by ADEA's prohibition on age discrimination.

66. The University discriminated against Ms. Jakubauskas on the basis of age by terminating her in violation of federal law and its policies and then replacing her with a younger employee.

67. Ms. Jakubauskas is protected by ADEA from discrimination on the basis of her age.

12

68. Ms. Jakubauskas was qualified for her position at the University.

69. Ms. Jakubauskas suffered adverse employment actions, including but not limited to her firing.

70. She was replaced by a younger employee.

71. There is no legitimate nondiscriminatory reason for the University's behavior.

72. Even if a legitimate nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

73. Ms. Jakubauskas has suffered severe professional, economic, and psychological harm as a result of this discriminatory process orchestrated against her.

74. She requests liquidated damages under the ADEA.

## COUNT II
### Age Discrimination in Violation of the VHRA

75. Ms. Jakubauskas incorporates all prior allegations as if fully stated herein.

76. Ms. Jakubauskas was an employee over 40 years of age at the University, entitling her to rights under the Virginia Human Rights Act.

77. The University is required to abide by ADEA's prohibition on age discrimination.

78. The University discriminated against Ms. Jakubauskas on the basis of age by terminating her in violation of federal law and its policies and then replacing her with a younger employee.

79. Ms. Jakubauskas is protected by VHRA from discrimination on the basis of her age.

80. Ms. Jakubauskas was qualified for her position at the University.

81. Ms. Jakubauskas suffered adverse employment actions, including but not limited to her firing.

82. She was replaced by a younger employee.

83. There is no legitimate nondiscriminatory reason for the University's behavior.

84. Even if a legitimate nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

85. Ms. Jakubauskas has suffered severe professional, economic, and psychological harm as a result of this discriminatory process orchestrated against her.

86. She seeks compensatory and punitive damages, and any other available relief, under the VHRA.

## COUNT III
### Negligence *Per Se*

87. Ms. Jakubauskas incorporates all prior allegations as if fully stated herein.

88. The United States Department of Education promulgated regulations interpreting Title IX, codified at 34 C.F.R. 106, titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance."

89. 34 C.F.R. 106 is a binding regulation on the University.

90. 34 C.F.R. 106 was enacted for public safety. Specifically, the regulations were designed to both protect victims of sexual harassment and to protect students and faculty accused of sexual harassment.

91. Ms. Jakubauskas, as a faculty member, belonged to the class of persons the regulations were designed to protect.

92. The University's violations of 34 C.F.R. 106 were a proximate cause of the injury to Ms. Jakubauskas, because the violations produced the harm to Ms. Jakubauskas and no efficient intervening cause exists that would have caused the harm to Ms. Jakubauskas.

93. As a result of the University's breach of 34 C.F.R. 106, Ms. Jakubauskas suffers and continues to suffer substantial financial harm. Accordingly, Ms. Jakubauskas requests compensatory, incidental, and emotional damages.

## COUNT IV
### Negligence

94. Ms. Jakubauskas incorporates all prior allegations as if fully stated herein.

95. In choosing to accept federal funding and adjudicate matters of sexual misconduct, the University assumed a duty to conduct its sexual misconduct

15

proceedings with reasonable care under the circumstances, to avoid foreseeable harm to students or faculty subject to its procedures.

96. It was foreseeable that Ms. Jakubauskas would be harmed by the University's complete and total disregard of its own Title IX procedures.

97. The University breached its duty to Ms. Jakubauskas when it subjected her to the Title IX process and failed to abide by its own procedures, and otherwise conducted itself in a biased or partial manner.

98. The University's action was a proximate cause of Ms. Jakubauskas's injury, because Ms. Jakubauskas's injury would not have occurred absent the University's action, and because no efficient intervening cause exists that would have caused the harm to Ms. Jakubauskas.

99. As a result of the University's breach of its duty, Ms. Jakubauskas suffers and continues to suffer substantial financial harm. Accordingly, Ms. Jakubauskas requests compensatory, incidental, and emotional damages.

## JURY DEMAND

100. Doe demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE Doe respectfully requests that this Court grant him the following relief against all Defendants:

1. Liquidated damages under the ADEA;

2. Other damages in an amount to be proved at trial;

3. Costs of suit;

4. Attorneys' fees, pursuant to 42 U.S.C § 1988(b); and

5. Such other and further relief as the Court deems necessary and proper.

Dated:  July 8, 2025

Laura Jakubauskas
By Counsel

BINNALL LAW GROUP, PLLC


*/s/ Benjamin F. North*
Benjamin North, VSB No. 97439
Lindsay R. McKasson, VSB No. 96074
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: ben@binnall.com
         lindsay@binnall.com

*Counsel for Plaintiff Laura Jakubauskas*

17